# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**PEGASUS IMAGING CORPORATION,**

     **Plaintiff,**

**v.**                          **Case No.  8:08-cv-1770-T-30EAJ**

**ALLSCRIPTS HEALTHCARE
SOLUTIONS, INC. and ALLSCRIPTS,
LLC,**

     **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss for Lack of Jurisdiction (Dkt. 142), Plaintiff's Memorandum in Opposition to same (Dkt. 165), Defendants' Motion for Partial Summary Judgment (Dkt. 163), Defendants' Memorandum in Support of same (Dkt. 178), Plaintiff's Memorandum in Opposition to same (Dkt. 186), Plaintiff's Motion for Partial Summary Judgment (Dkt. 166), and Defendants' Memorandum in Opposition to Same (Dkt. 185).   The Court, having reviewed the motions, responses, record evidence, and being otherwise advised in the premises, concludes that genuine issues of material fact preclude a dismissal for lack of jurisdiction and judgment in favor of any party.   Therefore, Defendants' Motion to Dismiss for Lack of Jurisdiction and the parties' Motions for Summary Judgment should be denied, with the exception that the Court is

granting summary judgment in Plaintiff's favor on Defendants' Tenth and Seventeenth Affirmative Defenses.

## **RELEVANT BACKGROUND**[1]

Plaintiff Pegasus Imaging Corporation ("Plaintiff" or "Pegasus" or "PIC") is in the business of creating, producing, selling, and distributing computer software programs. One such program is called Barcode Xpress, formerly known as Smartscan Xpress Barcode Version 3 ("SSX" or "barcode program"). SSX writes barcodes, locates barcodes on a page, decodes the barcodes, and, upon location, reports their contents and recognition confidence values.

According to Pegasus, it authored, created, and developed SSX, which consists of material wholly original and owned by Pegasus. According to Defendants, SSX is not wholly original and was not created by Pegasus.

Advanced Imaging Concepts, Inc. ("AIC") was in the business of offering software to healthcare providers that allowed them to computerize and digitize the paper-flow of their offices. AIC's flagship product was known as "ImpactMD."[2] ImpactMD is a software program that computerizes patient records and enables healthcare providers to store, access, retrieve, and review patient health records electronically in connection with providing patient

---

[1] As will be discussed in further detail, there are few "undisputed" facts in this case. Thus, this section merely reflects the relevant background facts, many of which are disputed. There are a number of additional material disputed facts that will be discussed throughout the Order in the context of the parties' argument.

[2] ImpactMD has been marketed by Defendants under a variety of different names, such as TouchWorks and TouchChart.

care.   During 2002, AIC investigated adding a barcoding option to ImpactMD.

Subsequently, on April 11, 2002, Pegasus and AIC entered into a one-page license agreement

(the "2002 License Agreement").  The 2002 License Agreement granted AIC "a limited non-

exclusive right and license":

> a)    To use and include in AIC products, (hereinafter "PRODUCT"), the PIC SmartScan Xpress Barcode COM runtimes (hereinafter: "CODE"), for the purposes of development, technical support, maintenance and warranty service of PRODUCT; and,
>
> b)    To use, reproduce, display or otherwise distribute or transfer copies of CODE, as an integral part of the PRODUCT application, in executable form only.

(Dkt. 1, Ex. A).  The 2002 License Agreement also provided, in pertinent part:

> AIC shall report PRODUCT installations promptly, and no later than within fifteen (15) days after the end of the calendar quarter in which CODE was installed.  AIC agrees to pay to PIC according to the fee structure outlined on PEGASUS' web site (currently: http://www.pegasustools.com/products/ssxpricing.htm#barcode) for the license to use CODE in each PRODUCT installation.  License fee payment is due to PIC no later than thirty days after the the [sic] end of the calendar quarter in which CODE was installed.

> PIC hereby warrants and represents that PIC has the exclusive right to grant AIC the rights granted herein.

> AIC will include a statement substantially similar to the following within PRODUCT electronic documentation: 'PRODUCT contains portions of imaging code owned and/or licensed by Pegasus Imaging Corporation, Tampa, FL. ALL RIGHTS RESERVED.'

(Id.).

The 2002 License Agreement was executed by Ed Kenney ("Kenney"), on behalf of

AIC, and Jack Berlin ("Berlin"), on behalf of Pegasus.  Testimony in the record reflects that

it was unusual for Kenney, who was in AIC's marketing department, to execute a licensing

agreement.  According to Berlin, who drafted the 2002 License Agreement on behalf of Pegasus, the 2002 License Agreement was "a simple short form for small companies." (Berlin deposition, Ex. 10).

AIC used the SSX toolkit to add a barcode recognition capability to ImpactMD. Subsequently, in approximately August 2003, AIC was acquired by Allscripts Healthcare Solutions, Inc. ("Allscripts Healthcare"), one of the Defendants in this case.  Allscripts, LLC ("Allscripts"), the other Defendant in this case is a subsidiary of Allscripts Healthcare. According to Defendants, a press release was issued announcing the acquisition of AIC by Allscripts Healthcare, and stating that ImpactMD would be incorporated into Allscripts Healthcare's Touchworks electronic health records product.  According to Plaintiff, it was unaware that AIC was acquired by Allscripts Healthcare.  James Orms ("Orms"), AIC's Chief Information Officer and Vice President of Operations, stated during his deposition that as part of its due diligence process related to the Allscripts acquisition, AIC notified all of its vendors of the transaction.  (Orms deposition at 113-116).

The record reflects that on April 10, 2002, Pegasus provided the SSX toolkit to AIC and immediately provided the necessary "unlock" codes for AIC to reproduce and distribute the toolkit as part of its larger software program.  (Berlin deposition, Ex. 6).  Specifically, the "unlock" codes were provided to Tim Miller ("Miller"), who was AIC's Senior Applications Developer.  During his deposition, Miller was uncertain as to when he inserted Pegasus' barcode toolkit in AIC's software.  The record does not reflect any evidence as to the exact date that this occurred.  Because these events occurred many years prior to the

filing of this action, e-mails between the parties are helpful to demonstrate the parties' behavior after the execution of the 2002 Licensing Agreement.

On June 7, 2002, Jeff Amrein ("Amrein"), an AIC executive, sent an e-mail to John Leonard ("Leonard"), a Pegasus salesman with whom he had discussed licensing another product, stating "I found out that we already use your bar-coding product." (Leonard Deposition, Ex. 5). On October 15, 2002, Leonard sent an e-mail to Amrein stating "I know that you are under license for our SmartScan Xpress Barcode component" and requesting that Amrein provide Leonard with examples of "real world" barcodes for Pegasus' internal testing. (Leonard Deposition, Ex. 20). On October 16, 2002, Amrein sent an e-mail to Leonard stating: "We have our first customer, in California, for installation of our barcoding Component. They will scan and process about 10,000 pages per day using barcodes to file everything". (Leonard Deposition, Ex. 21). Also on October 16, 2002, Leonard sent an e-mail to Amrein stating:

> Thanks for giving me the heads up on your utilization of our SmartScan Xpress barcode component. We had noted that you licensed it earlier in the year and we're pleased to hear that your first client installations are imminent. Since you report these runtimes in arrears, you should go ahead and report "o" for Q3 and respond to the reporting email that our accounting group sent earlier in the month. Then, when you get the Q4 request in January, you can reflect the accurate number of runtimes for your new California client and any other deployments that may take place between now and 12/31. Pretty easy.

(Leonard deposition, Ex. 22). Notably, during this time, the parties were also negotiating a potential licensing agreement for AIC to utilize Pegasus' image viewing component ("ImagN" or "viewing program").

On January 8, 2003, Leonard sent an e-mail to John Reinhart ("Reinhart"), AIC's Executive Vice-President, and Amrein making a suggestion on how they should prepare their first quarterly activity report to Pegasus and stating, in pertinent part, "Obviously, we have a royalty credit balance that will be applied to the number you report for both SmartScan Xpress Barcode and for ImagN users." (Leonard deposition, Ex. 28).[3] On January 20, 2003, Pegasus' business manager/controller, Kristy Andrews ("Andrews"), sent an e-mail to Amrein stating:

> Pegasus Imaging Corporation supplies you technology which is not being reported. This constitutes a contract violation.  After successive missed quarterly license reporting periods and in spite of repeated attempts to collect the information due Pegasus according to our contract with you ("Pegasus Code"), we wish to inform you that your Agreement with us is very close to being terminated.  A failure to respond within ten days of this email will require us to take action promptly.  As a result of termination, we would demand (i) that the Pegasus Code be immediately removed from all of your products, (ii) that Pegasus Code no longer be included with any product of yours, (iii) a full accounting of your use of Pegasus Code up to the termination date, and, (iv) that we receive an affidavit of an officer of your corporation stating that the Pegasus Code has been removed and will not be further used, plus attesting to the accounting referenced above.

(Leonard deposition, Ex. 30).  On that same day, Leonard sent an e-mail to Amrein stating that Andrews' e-mail was sent because of the "no reports" on the 2002 Licensing Agreement and that a report of "zero" should have been sent to Andrews for the third quarter.  Leonard also stated that "I remember you mentioning that your very FIRST install only took place a

---

[3] Notably, the 2002 Licensing Agreement makes no reference to a "royalty credit balance."  During his deposition, Leonard stated that his e-mail was incorrect with respect to the royalty credit balance applying to SSX and that it should have just applied to the ImagN product.  (Leonard deposition at 193).  However, as discussed in more detail herein, the record contains conflicting facts regarding whether the 2002 Licensing Agreement was subsequently amended by the parties in a number of different and material respects, including payment.

couple of months ago." (Leonard deposition, Ex. 30). On that same day, Amrein sent an email to Leonard, apologizing for the missed report and stating that "I can report that we have zero sales of licenses but have started the first project with the barcoding. The barcoding project was started January 4th and will be reported in the January report." (Leonard deposition, Ex. 31). On January 21, 2003, Leonard sent an internal e-mail to Andrews stating "Apparently, he is rolling the barcode install into Q1's report although he told me it was 'sold' in November. Not worth the argument and I'll keep you posted in April once these new guys hopefully 'come on line' and report some decent numbers." (Id.). That same day, Leonard also sent an e-mail to Amrein thanking him for the update and stating that Pegasus will note "zero" for SSX for the fourth quarter of 2002 and that the next report is not due until April.

During this same time, e-mails between the parties indicate problems AIC was having with Pegasus' ImagN product regarding annotation support. On February 4, 2003, Amrein sent an e-mail to Leonard stating that AIC was not going to use the ImagN product. Regarding the barcoding project, Amrein stated: "As for the investment we have made in your company...the bar-coding project is scheduled to kick off this Thursday and Friday and we expect it to be a great success. We will eventually absorb the cost of the viewer dollars in the bar-coding needs for the future." (Leonard deposition, PEG007172). On February 25, 2003, Reinhart sent an e-mail to Leonard stating:

> I would like to speak to you regarding the future estimates of sales from AIC. [Amrein] has informed me that will [sic] are unable to utilize your products for our large Nasdaq Company partners given the limitations on your technology related to

annotations.  This will severely reduced [sic] the license fees AIC will owe Pegasus.
I have our $8,000 deposit check on my desk and would like to see if there is anyway
to reduce the amount we send to match up to our expected barcode sales going
forward.  I think that $1,000 up front will be more than a quarters worth of sales and
then we could update every quarter thereafter.  I don't want to create a scenario where
we never sell enough product and the large deposit has to be returned.

(Leonard deposition, Ex. 33).  On March 3, 2003, Reinhart sent an e-mail to Leonard stating:

Thanks for the call last week.  As we discussed, AIC will deposit $4,000 check with
your company as a good faith amount per our agreement.  We will update you
monthly of our sales for bar coding and look forward to discussing opportunities as
they may occur for development in the future.  Please confirm with me via e-mail
Pegasus's agreement with our new understanding of the $4,000 amount on deposit.
If for some reason a majority of this amount is still unused at Dec 31, 2003 Pegasus
will agree to reduce the deposit to reflect our experienced business activity at that
point based on estimate going forward.

(Leonard deposition, Ex. 35) (emphasis added).  That same day, Leonard sent an e-mail to

Reinhart stating:

Thanks for the written confirmation.  A quarterly update on the barcode is sufficient
and actually what the agreement called for.  You can start that in April.  We will
indeed reflect a royalty credit of $4000 and can apply barcode runtimes to that credit
or even future ImagXpress 7.0 royalties should you ultimately decide in that direction.
We decided on $4000 based on your estimate that $8000 would take 2 years to use up.
That 2 year figure seemed an unreasonable amount and length of time to Pegasus
Imaging.  If you have over $2000 remaining after your 12/31 barcode report for Q4,
then we will reduce the deposit as you describe below.

(Id.).

The record reflects that sometime in June 2003, Pegasus invoiced AIC for $395 and

deducted that amount from the deposit balance it was holding.  (Leonard deposition, Ex. 41).

The record also reflects confusion within Pegasus' accounting department with the $4,000

deposit (which was originally $8,000 when ImagN was involved) and how it should be

handled.  (Leonard deposition, Ex. 40,43).  On January 12, 2004, in an internal e-mail from

Leonard to Andrews, Leonard stated that AIC was "successfully deploying our barcode

component."  (Leonard deposition, Ex. 40).  In that same e-mail, however, Leonard also

stated:

> They are now drawing off the 4k balance with barcode reporting which they are doing
> a poor job of selling.  Bottom line, don't refund, don't credit anything before talking
> with Russ and I.  If they come back to us wanting more money, it will be a sales issue.
> Kel had no action item other than keeping an eye on their barcode runtimes and
> pulling from their existing balance.

(Id.).

On March 1, 2004, Leonard sent an internal e-mail to Andrews questioning the credit

given to AIC for $395 and stating:

> We've done nothing with Advanced Imaging in Kentucky for over a year and I don't
> know why we would be crediting them this amount.  Is it possible or reasonable for
> me to get a quick email when you guys think a credit is appropriate for one of my
> assigned accounts?  Again, four hundred bucks won't kill me but I want to avoid a
> several thousand dollar issue in the future.  Thought I'd ask.

(Leonard deposition, Ex. 42).

The record is unclear as to what happened to the parties' relationship after March

2004.  On October 1, 2004, Pamela Nixon ("Nixon"), an employee in Pegasus' accounting

department, sent the quarterly royalty report form to Orms.  (Leonard deposition, Ex. 45).

On that same day, Leonard sent an internal e-mail to Nixon stating: "I thought we agreed that

these guys are dead.  That you were just going to remove them from the system?  They no

longer deploy."  (Id.).  According to Leonard, he sent this e-mail to Nixon because a lot of

time had transpired and AIC had notified him that it was not going to deploy the barcode

program.  The record does not reflect how this was communicated to Leonard from AIC and Leonard testified during his deposition that the best recollection he had was that it was communicated to him orally.

According to Leonard, after he sent the e-mail to Nixon, AIC was removed from Pegasus' accounting system, because he didn't want accounting tracking AIC and maintaining records on AIC and sending the royalty report forms to AIC when AIC no longer intended to deploy Pegasus' barcode program.  It is unclear in the record whether Leonard ever notified AIC that Pegasus was removing it from its accounting system or that Pegasus considered AIC a "dead" customer.  It is undisputed in the record, however, that during this time Pegasus never communicated to AIC that the 2002 Licensing Agreement was terminated.  It also appears undisputed in the record that during this time Pegasus never communicated to AIC that Pegasus' code should be immediately removed from all of AIC's products, that Pegasus' code could no longer be included with any of AIC's products, that AIC should send Pegasus a full accounting of its use of Pegasus code, or that AIC should complete an affidavit stating that the Pegasus code had been removed.

According to Amrein, Miller, Reinhart, and Orms, who, as set forth herein, were the parties involved on behalf of AIC during the 2002-2004 time period, Pegasus' barcode program never worked.  Specifically, Amrein testified during his deposition that AIC consistently reported zero installations to Pegasus until Pegasus unilaterally stopped sending the royalty report forms to AIC.  According to Amrein, Miller, and Orms, AIC tried to get the barcode program to work during beta testing, but the barcode program was never

successful.  The record also reflects evidence that Pegasus' barcode program was never sold to customers during this time, because it never got out of beta testing.  The record also reflects that it was possible that Pegasus' barcode program could remain on AIC's software, since it was inserted in a beta-version of AIC's software, but that it was AIC's belief that royalties would only be owed to Pegasus if the barcode program was actually sold to customers and/or used by the customers.[4]

It is unclear in the record whether Defendants used and/or further developed and/or tested Pegasus' barcode program during the 2005-2006 time period.  To complicate matters, by 2007, Amrein, Miller, Reinhart, and Orms were no longer working for Defendants.  Orms' position was replaced by David Zang ("Zang") in 2007.  Amrein's position was replaced by Joseph Luber ("Luber") in 2007.  During Luber's deposition, he deferred to Zang regarding whether Pegasus' software was within the ImpactMD software, although he later testified that he had an understanding that at some point Pegasus' software was put into the ImpactMD code base, and from that point forward remained in the ImpactMD code base.

According to Zang, he first learned that Pegasus' barcode program was within Defendants' products around or soon after April of 2007.  His recollection was that he became aware of this when he started to get complaints from the support department that there was an issue with barcoding recognition.  Zang then directed Ray Gondzur

---

[4] There is a disputed fact on this issue.  According to Berlin, who, as set forth herein, drafted the 2002 Licensing Agreement, AIC should have paid a royalty fee on any installation regardless of whether the installation was for beta testing.  However, the record reflects that this is not how the parties operated under the 2002 Licensing Agreement.  Specifically, when AIC communicated to Pegasus its deployment to customers for testing, Pegasus did not demand that AIC pay a royalty fee for those deployments.

("Gondzur"), an Allscripts developer, to research the error issue.  After Gondzur attempted, unsuccessfully, to fix the issues, Zang recommended that Gondzur track down the registration issue and contact support.  According to Zang, Miller, who was no longer an employee at this time, left a record of registration information, particularly for third-party vendors.  After locating this information, Gondzur then contacted Pegasus.  According to Zang, after Gondzur discussed the barcoding issues with Pegasus' support department, Pegasus advised him that he needed to upgrade the program.

Also in February or early March of 2007, Joel Rush ("Rush"), a recently hired Pegasus salesman who was unaware of the previous history between Pegasus and AIC, was informed by an Allscripts representative at a trade show that Allscripts was using the SSX/barcoding toolkit.  At some point, Rush discussed this matter internally at Pegasus[5].  It appears that Pegasus then discussed the issue with Defendants around June 2008 and that both parties engaged in their own investigation of the arrangement between Pegasus and AIC for AIC's use of the barcoding software.

According to Russell Puskaric ("Puskaric"), Pegasus' Vice-President of Sales, at some point after Rush notified him that Allscripts was using Pegasus' software, Pegasus did some research, looked up account folders, and determined that there was already a license that Defendants had failed to report on for several years of performance.  According to Puskaric, it was around this time that Pegasus became aware that AIC was acquired by Allscripts

---

[5] There is conflicting testimony on when Rush actually reported this issue internally.  During Puskaric's testimony on behalf of Pegasus, he states that Rush did not tell him about Defendants' use of Pegasus' software until April or May of 2008.

Healthcare Solutions, Inc., however, Puskaric concluded that the 2002 Licensing Agreement was transferable and still in effect.[6]  Also, Berlin testified during his deposition that AIC would not need Plaintiff's permission to assign the 2002 Licensing Agreement.

According to Zang, he confirmed that Pegasus' barcoding toolkit files appeared in each copy of ImpactMD because, in order to beta test the toolkit, it would have been copied into the overall collection of the ImpactMD code base that is distributed with each copy of the application received by clients.  According to Zang, he determined that the barcoding toolkit was deployed with each client installation of ImpactMD regardless of whether the client used barcoding and 50 percent or less of Defendants' clients actually used barcoding. Zang was initially under the impression that the licensing arrangement with Pegasus was a buy once royalty free distribution.   Zang later came to the conclusion based on his investigation that Reinhart and Leonard entered into an amended agreement changing the terms and reporting of the licensing for the barcoding program from what is stated in the 2002 Licensing Agreement.

After the parties were unable to negotiate a new agreement or amended agreement, Pegasus sent a letter to Allscripts, LLC, dated July 28, 2008 (the "Termination Letter"), terminating Allscripts, LLC's "ongoing granted rights to deploy" Pegasus' barcoding program.  (Puskaric deposition, Ex. 14).  Specifically, the Termination Letter stated that:

---

[6] Puskaric was deposed a second time as a corporate representative of Pegasus and changed his earlier testimony regarding whether the 2002 Licensing Agreement was transferable, stating that it was nontransferable.

After several unsuccessful attempts to establish the appropriate License Agreement between our two companies, we wish to inform you that <u>ongoing granted rights to deploy Pegasus Code are terminated</u>, effective immediately.   As a result of termination, we demand (i) that the Pegasus Code be immediately removed from all of your products, (ii) that Pegasus Code no longer be included with any product of Allscripts, LLC and, (iii) that we receive an affidavit of an officer of Allscripts, LLC, by fax or US mail, stating that the Pegasus Code has been removed and will not be further used until which time an appropriate licensed issued by Pegasus is in place.

(Id.) (emphasis added).

On September 8, 2008, Pegasus filed its complaint against Defendants and alleged claims for: breach of contract (Count I); contributory copyright infringement (Count II); vicarious and contributory copyright infringement (Count III); Florida Trade Secrets Act (Count IV); Florida Deceptive and Unfair Trade Practices Act (Count V); and reverse passing off under the Lanham Act (Count VI).

## DISCUSSION

### I.   Defendants' Motion to Dismiss Plaintiff's Copyright Claims for Lack of Jurisdiction

The Court must first determine Defendants' Motion to Dismiss for Lack of Jurisdiction, because if the Court does not have jurisdiction over Plaintiff's copyright claims, the Motions for Summary Judgment on those claims are moot.   According to Defendants, the record reflects that the deposit material Pegasus submitted to the United States Copyright Office in connection with the copyright registration at issue in this case is not the work that is reflected on its copyright registration and that Pegasus alleges was infringed by Defendants, but is instead a different, later work.   Plaintiff denies Defendants' claim and

states that, at the very least, there is a disputed fact on this issue, which must be left for the jury to decide.

"[W]hen a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) involves factual questions, the court engages in a two-part inquiry." Torres-Negron v. J&N Records, LLC, 504 F.3d 151, 162 (1st Cir. 2007). Initially, the court must determine if Defendants attack on the complaint is facial or factual. "Facial attacks on the complaint 'require the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997) quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). "Factual attacks, on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" Id.

"[W]here . . . 'the jurisdictional issue and substantive claims are so intertwined the resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment.'" Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). If the court determines that there is a genuine dispute of material jurisdictional facts, the case proceeds to trial, so that the fact finder can determine the facts, and the jurisdictional dispute is re-evaluated at that point. J&N Records, LLC, 504 F.3d at 162.

Section 411(a) of the Copyright Act provides in relevant part as follows:

> No action for infringement of the copyright in any United States work shall be instituted until . . . registration of the copyright claim has been made in accordance with this title.

It is well-established in the Eleventh Circuit that Section 411(a)'s registration requirement is a jurisdictional prerequisite to a copyright infringement suit. St. Luke's Cataract and Laser Institute, P.A. v. Sanderson, 573 F.3d 1186, 1201 (11th Cir. 2009).[7]

Submission of a bona fide copy of the work being registered, i.e., the copyright deposit material, to the Copyright Office for examination is an integral part of the registration process. 17 U.S.C. §408(a). "A copyright registrant is required to deposit with the Copyright Office two complete copies of the best edition of a published work with a registration application." St. Luke's Cataract and Laser Institute, P.A., 573 F.3d at 1194 (citing 17 U.S.C. § 408(b); Geoscan, Inc. v. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir.2000) ("In order to obtain a valid copyright registration for a published work, the applicant must submit two complete copies of the work.")). "Copies" as used in Section 408 does not mean later reconstructions of the original, nor does it mean later versions of the work, including subsequent revisions to a software program. See, e.g., Geoscan, Inc., 226 F.3d at 393 (dismissing plaintiff's copyright infringement claim for lack of jurisdiction where the facts reflected that plaintiff submitted a later version of the source code).

In St. Luke's Cataract and Laser Institute, P.A., the Eleventh Circuit noted:

---

[7] As the Eleventh Circuit stated in St. Luke's, the Supreme Court recently granted certiorari in a case that may clarify the jurisdictional nature of the registration requirement. See Reed Elsevier, Inc. v. Muchnik, 129 S. Court. 1523 (2009).

A certificate of registration satisfies the registration requirement in § 411(a) 'regardless of whether the certificate contains any inaccurate information, unless ... (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.' *Id.* § 411(b)(1). '[O]missions or misrepresentations in a copyright application can render the registration invalid' where there has been 'intentional or purposeful concealment of relevant information.' *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 828 (11th Cir.1982). Thus, there must be a showing of 'scienter' in order to invalidate a copyright registration. *Id.* 'In general, an error is immaterial if its discovery is not likely to have led the Copyright Office to refuse the application.' *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1161 (1st Cir.1994).

573 F.3d at 1201-03.

After carefully reviewing the record in this case, the Court concludes that there are genuine issues of material fact regarding whether Plaintiff met the deposit requirements and whether Plaintiff intentionally concealed information relevant to the copyright application. Notably, on June 15, 2000, Pegasus first published the code at issue in this case. After June 15, 2000, the record reflects disputed facts regarding whether the code was substantially revised prior to the 2008 registration demonstrating that the deposit could have been a reconstruction, rather than a copy of the original work. Importantly, because the registration was made more than five years after first publication of the work, Pegasus does not benefit from a presumption of validity of the copyright registration. See Montgomery v. Noga, 168 F.3d 1282, 1289 (11th Cir. 1999). Moreover, the expert report of Ralph Oman creates a material disputed fact regarding whether Pegasus sought to mislead the Copyright Office in a number of material instances. (Dkt. 194, Ex. K).

Accordingly, these issues must be determined by the jury in this case and Defendant's

Motion to Dismiss for Lack of Jurisdiction must be denied.

## II.     The Parties' Motions for Summary Judgment

## A.     <u>Summary Judgment Standard of Review</u>

Motions for summary judgment should only be granted when the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

show there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat

an otherwise properly supported summary judgment motion; "the requirement is that there

be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986) (emphasis in original).  The substantive law applicable to the claimed causes of action

will identify which facts are material.  <u>Id</u>.  Throughout this analysis, the court must examine

the evidence in the light most favorable to the non-movant and draw all justifiable inferences

in its favor.  <u>Id.</u> at 255.

Once a party properly makes a summary judgment motion by demonstrating the

absence of a genuine issue of material fact, whether or not accompanied by affidavits, the

nonmoving party must go beyond the pleadings through the use of affidavits, depositions,

answers to interrogatories and admissions on file, and designate specific facts showing that

there is a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  The evidence must be

significantly probative to support the claims.  <u>Anderson</u>,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

**B.    Legal Discussion**

**1.    Count I of Plaintiff's Complaint (Breach of the 2002 License Agreement)**

Plaintiff moves for summary judgment on Count I of its complaint, arguing that the facts are undisputed that the 2002 License Agreement was breached when the 2002 Agreement was transferred without Plaintiff's consent. Plaintiff also argues that it is undisputed that Defendants breached express provisions of the 2002 License Agreement regarding quarterly reporting, payment, and attribution of Plaintiff's product.

A review of the record demonstrates disputed facts on all of these issues. As set forth herein, there is evidence suggesting that the parties modified the 2002 License Agreement. Notably, the 2002 License Agreement did not have language preventing subsequent modification. Moreover, the deposition testimony and e-mails reflect that the parties were

unclear as to the terms of the 2002 License Agreement and, through their subsequent conduct, modified the terms, especially as they related to payment and reporting.

There is also evidence in the record suggesting that even Plaintiff considered the 2002 License Agreement transferrable to Defendants and that Plaintiff did not terminate the 2002 License Agreement until July 28, 2008, when it sent the Termination Letter. Also, the 2002 License Agreement does not state that it cannot be transferred or assigned. The 2002 License Agreement does not contain a termination provision. Moreover, there is conflicting evidence in the record regarding whether Defendants provided attribution for Plaintiff's barcoding program in their products.

The only thing that is apparently undisputed in the record is that the parties did not act in conformance with the 2002 License Agreement, that Plaintiff's barcode program was in Defendants' product to its customers, and, other than a potential payment for $395, Plaintiff was not compensated for the installation of its product.[8]  Accordingly, it will be for the jury to decide whether the parties modified or came to a subsequent agreement for the licensing of Plaintiff's barcode program, the terms of that subsequent agreement, and when Plaintiff ultimately terminated that agreement. At this stage, it would be inappropriate for the Court to weigh the credibility of the testimony in the record regarding these material facts in order to determine whether a breach occurred and to what extent it occurred. Thus, Plaintiff's Motion for Summary Judgment on Count I of its complaint must be denied.

---

[8] It is unclear in the record what happened to the $4,000 deposit, other than the $395 being applied against it.

Similarly, Defendant's Motion for Summary Judgment on Count I as to a finding that Plaintiff's contract remedy is limited to a "reasonable price" must be denied because there are disputed facts in the record regarding whether the price was open for installations of 50 or more.

### 2.    Counts II and III of Plaintiff's Complaint (Copyright Claims)

Both parties move for summary judgment on Plaintiff's copyright claims (Counts II and III).  In order to sustain a claim for copyright infringement, Plaintiff must show by a preponderance of the evidence that: (1) Plaintiff owns a valid copyright in the barcode software and (2) Defendants copied "constituent elements of the copyrighted work that are original."  Calhoun v. Lillenas Pub., 298 F.3d 1228, 1232 (11th Cir. 2002).  A copyright owner may bring a claim for infringement against a licensee whose actions exceed the scope of the license.  Leutwyler v. Royal Hashemite Court of Jordan, 184 F. Supp. 2d 303, 306 (S.D.N.Y.2001).  It is axiomatic that Plaintiff can assert claims against Defendants for breach of license and copyright infringement.  Tingley Systems, Inc. v. HealthLink, Inc., 509 F. Supp. 2d 1209 (M.D. Fla. 2007).

"Liability may be imposed under theories of vicarious liability or contributory infringement."  M.L.E. Music Sony/ATV Tunes, LLC. v. Julie Ann's, Inc., 2008 WL 2358979, at *3 (M.D. Fla. 2008).  A corporation or individual is held vicariously liable "for copyright infringement if he: '(1) has the right and ability to supervise the infringing activity, and (2) has a direct financial interest in such activities.'" Id.  A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to

the infringing conduct of another." Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 845 (11th Cir. 1990).

As discussed herein, there are disputed facts regarding the validity of the copyright registration. Moreover, there are disputed facts regarding the terms and scope of the 2002 Licensing Agreement, including whether the 2002 Licensing Agreement was subsequently modified and when the 2002 Licensing Agreement was ultimately terminated. There are facts in the record suggesting that the license was in effect until July 28, 2008 and that Defendants were granted ongoing rights to use the barcoding program until that time. Accordingly, the Court cannot grant summary judgment in either party's favor on the copyright claims and it will be for the jury to decide these issues. See Tingley Systems, Inc. v. HealthLink, Inc., 509 F. Supp. 2d 1209, 1217 (M.D. Fla. 2007) (denying motion for summary judgment on copyright claims "because there are issues of material fact as to the scope of the license and whether [defendant] exceeded the scope of the license").

Plaintiff's and Defendants' Motions for Summary Judgment as to Counts II and III of Plaintiff's complaint must be denied.

### 3.    Count IV of Plaintiff's Complaint (Florida Trade Secrets Act)

Defendants move for summary judgment on Plaintiff's claim under the Florida Trade Secrets Act arguing that there is no evidence of misappropriation of trade secrets. To prevail on a claim under the Florida Trade Secrets Act, Plaintiff must prove (1) it possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated. Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1338 (M.D.

Fla. 2006); Fla. Stat. § 688.002.  In a trade secret action, the plaintiff bears the burden of demonstrating the specific information it seeks to protect is a trade secret.  American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11ᵗʰ Cir. 1998).

The record contains material disputed facts on this claim that preclude summary judgment.  There is evidence suggesting that Defendants misappropriated Plaintiff's barcode program, given that it was included in Defendants' products to its customers for years and, at some point, this use was unauthorized by Plaintiff.  There is evidence suggesting that Defendants' misappropriation may have included Plaintiff's source code and that this source code constitutes a trade secret.  There is also evidence, (although, on the record before the Court, the Court submits that this evidence is not overwhelming), suggesting that Plaintiff took reasonable steps to protect the secrecy of the source code for the barcode program.

Accordingly, Defendant's Motion for Summary Judgment on Count IV of Plaintiff's complaint must be denied.

**4.      Counts V and VI of Plaintiff's Complaint (FDUTPA and Lanham Act)**

Defendants move for summary judgment on Plaintiff's claims under FDUTPA and the Lanham Act, which are confined to parallel claims of reverse-passing-off.[9]  Specifically, Defendants argue that, putting aside Plaintiff's failure to establish itself as the author and owner of the barcode program, it is undisputed that Defendants did accurately identify Plaintiff as the copyright owner of the barcode program.  Defendants further argue that

---

[9] Plaintiff seems to concede this issue in its response to Defendants' Motion for Summary Judgment and the Court agrees that these claims are confined to claims of reverse-passing-off.  See Pegasus Imaging Corp. v. Northrop Grumman Corp., 2008 WL 5099691, at *6 (M.D. Fla. 2008).

Plaintiff has no evidence of customer confusion and harm. Plaintiff also moves for summary judgment on its claim of reverse-passing-off under the Lanham Act, arguing that it has met all of the elements of this claim.

To establish a claim for reverse-passing-off, a plaintiff must show: 1) the item at issue originated with the plaintiff; 2) the defendant falsely designated the origin of the work; 3) the false designation was likely to cause consumer confusion; and 4) the plaintiff was harmed by the defendant's false designation. <u>Northrop Grumman Corp.</u>, 2008 WL 5099691, at *6.

Plaintiff argues in its response to Defendants' Motion for Summary Judgment on this issue that, in the alternative, there is a genuine issue of material fact as to whether Defendants caused confusion among its consumers by distributing Plaintiff's product as if it belonged to Defendants. The Court agrees that the record reflects disputed facts on this element that must preclude summary judgment in either party's favor. Indeed, it is not even clear in the record whether Defendants provided sufficient attribution to Plaintiff in their products so that a customer and user would know that the barcode software belonged to Plaintiff. Testimony from Amrein and Miller suggested that an attribution to Plaintiff was never included in AIC's product, specifically, ImpactMD. However, Plaintiff's own expert, Matthew Decker, stated in his expert report that Defendants' Touchworks product included references to Pegasus Software. There is also a material disputed fact on the issue of whether consumers would likely be confused by the lack of an attribution of Plaintiff. Moreover, there is a material disputed fact on the issue of whether Plaintiff was harmed by any false designation.

Accordingly, these issues must be decided by the jury in this case and both parties'

Motions for Summary Judgment on Counts V and VI of Plaintiff's complaint must be denied.

## C.    **Defendants' Affirmative Defenses**

Defendants move for summary judgment on its affirmative defense that Plaintiff's

claims are barred, or limited, by the statutes of limitations.  Plaintiff argues that there is a

disputed fact on this issue.  The Court agrees that there are genuine issues of material fact

that would preclude granting summary judgment on this issue.  There are numerous facts

suggesting that Plaintiff knew or should have known in 2003 or 2004 that Defendant was

installing the barcode program in its products.  Indeed, Berlin, who as set forth herein,

drafted the 2002 License Agreement on behalf of Plaintiff, testified during his deposition that

as of January 2003, there was plenty of reason to believe that AIC had breached the 2002

License Agreement and that Plaintiff at that time was already convinced that it was not being

told the truth by AIC, and was further convinced that its code was being used and not being

paid for.  (Berlin deposition at 34, 38-39, 117-19).  There is also evidence in the record,

however, suggesting that Plaintiff was unaware of Defendant's continued use of the barcode

program until the 2007-2008 time period.  Accordingly, this issue is for the jury to decide

and Defendants' Motion for Summary Judgment on this defense must be denied.

Plaintiff, in various footnotes contained in its Motion for Summary Judgment,

attempts to request summary judgment on a number of Defendants' affirmative defenses.

(Dkt. 166, fns. 5, 10, 12, and 15).  Specifically, in footnote 5 of its Motion for Summary

Judgment, Plaintiff argues that it is entitled to summary judgment on Defendants' Twenty-

First Defense and Twenty-Fourth Defense/Counterclaim, which allege that Plaintiff's copyright is invalid because Plaintiff committed fraud on the copyright office. As previously set forth herein, there is a material disputed fact in the record regarding whether Plaintiff committed fraud and Plaintiff's request for summary judgment on these defenses is denied.

In footnote 10 of Plaintiff's Motion for Summary Judgment, Plaintiff moves for summary judgment on Defendants' Seventeenth and Tenth Affirmative Defenses, which relate to the first sale doctrine and the fair use doctrine, respectively. The Court agrees that these defenses are not applicable to this case[10] and it appears that Defendants concede this issue because they do not respond to Plaintiff's argument for judgment on these defenses. Accordingly, summary judgment is granted in Plaintiff's favor as to both the Seventeenth and Tenth Affirmative Defenses.

In footnote 12, Plaintiff argues that it is entitled to summary judgment on Defendants' Twentieth Affirmative Defense. This defense states that:

> Plaintiff, upon information and belief, has licensed one or more third parties to make unlimited use of the Smartscan Xpress Barcode product, including an unlimited right to sublicense to others. Defendants have entered into broad licensing agreements with one or more such third parties who are licensees of Plaintiff. Defendants' investigation into whether its agreements with such third parties incorporate rights granted to those third parties by Pegasus is ongoing, but, upon information and belief, Defendants' use of the Smartscan Xpress Barcode product has at all relevant times fallen within the scope of license(s) granted by one or more third parties.

---

[10] The first sale doctrine is premised on a sale of the particular work in question and the record does not reflect any evidence that Plaintiff sold the barcode program to Defendants. The fair use doctrine applies when the copying is not for commercial use, which is also not applicable in this case.

(Dkt. 121).   Defendants argue that summary judgment on this affirmative defense is not appropriate because there is evidence in the record to support the defense based on Plaintiff's software license agreements with these third parties and Defendants' agreement with these same third parties.   (Dkt. 185, Exhibits H and I).   The Court agrees that this record evidence creates a disputed fact on these defenses and Plaintiff's request for summary judgment on these defenses is denied.

Lastly, in footnote 15, Plaintiff moves for summary judgment on Defendants' First, Second, Third, Fourth, Sixth, Sixteenth, and Twenty-Second Affirmative Defenses.   Plaintiff, without describing the defenses in any great detail, states that "the gravamen of these defenses are Defendants' allegations that Plaintiff knew of Defendants' actions and either failed to act, acquiesced, or otherwise consented to Defendants' conduct." (Dkt. 166, fn. 15). Contrary to Plaintiff's argument that these defenses are unsupported in the record, the Court concludes that there is ample evidence in the record supporting these defenses, i.e., that Plaintiff failed to act, acquiesced, or otherwise consented to Defendants' conduct. Accordingly, these issues must be left for the jury to decide and Plaintiff's request for summary judgment on these defenses is denied.

## <u>CONCLUSION</u>

For the reasons set forth herein, it is ORDERED AND ADJUDGED that:

1.   Defendants' Motion to Dismiss for Lack of Jurisdiction (Dkt. 142) is hereby **DENIED.**

2.   Defendants' Motion for Summary Judgment (Dkt. 163) is hereby **DENIED.**

3.      Plaintiff's Motion for Summary Judgment (Dkt. 166) is hereby **DENIED**, with

the exception that the Court is granting summary judgment in Plaintiff's favor

on Defendants' Tenth and Seventeenth Affirmative Defenses.

**DONE** and **ORDERED** in Tampa, Florida on February 9, 2010.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2008\08-cv-1770.msjs.frm